IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| GREGG D. WHITFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-096-JHP-FHM |
| | ) | |
| LINCOLN NATIONAL LIFE INSURANCE | ) | |
| COMPANY, formerly JEFFERSON PILOT | ) | |
| FINANCIAL INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

Before the court in this ERISA[1] case are Plaintiff Gregg D. Whitfield's Opening and Response Briefs (Docket Nos. 20, 25), and Defendant Lincoln National Life Insurance Company's opening[2] and Response Briefs (Docket Nos. 21, 26). For the reasons cited herein, Lincoln National's denial of Whitfield's long-term disability claim is affirmed.

## BACKGROUND

I.      Policy Coverage and Provisions

Until June 9, 2006, Plaintiff Gregg Whitfield worked at the Christian Family Service Management Corporation as a "Case Manager/Therapist."[3] Admin. Rec. at 447, Docket Nos. 18, 19 (hereinafter "Admin. Rec."). As a result of this employment, Plaintiff had certain long term disability benefits through a policy issued by Defendant, Lincoln National.[4] This long-term disability policy

---

[1] The parties have stipulated that "[t]his case is governed by ERISA." *See* Joint Status Report at 3, Docket No. 14.
[2] Though termed a "Motion for Judgment on the Administrative Record" by Defendant, this document discusses the merits of the case and will be construed as an "Opening Brief" in accordance with the schedule entered for this case on July 26, 2010. *See* Minute Sheet *re: Scheduling Conference*, Docket No. 17.
[3] The Job Description provided by Plaintiff's employer and signed by Plaintiff summarizes Plaintiff's job as follows:
> Manages a caseload of foster children, acting as a resource to the child and foster family and serving as a liaison among the biological family, the referring agency and the child. Facilitates the provision of safe, secure and nurturing living experiences in accordance with The Blair Foundation's mission.

*See* Admin. Rec. at 499.
[4] At the time of Plaintiff's employment the long term disability policy was issued by Jefferson Pilot Financial Insurance Corporation. During the administrative review of this case, Jefferson Pilot merged with Defendant Lincoln National Life Insurance Company. *See* Amended Complaint ¶ III, Docket No. 4; Answer ¶ 3, Docket No. 11.

provides a Total Disability Monthly Benefit if the employee is (a) totally disabled, (b) under the regular care of a physician, and (c) submits proof of continued "total disability" and "physician's care" to the insurer upon request. *Id.* at 59. The long-term benefits provided by the plan are divided into two general time periods: (a) the "Own Occupation" period, which begins after the initial 180-day elimination period and lasts through the following twenty-four months, and (b) all the time thereafter.[5] *See id.* at 42, 46, 59. The terms "total disability" or "totally disabled" are defined separately during these two time periods. During the "Own Occupation Period," total disability "means that due to a Disability the Insured Employee is unable to perform all of the material and substantial duties of his or her own occupation." *Id.* at 59. To elaborate on this definition, "own occupation" is defined as

> the occupation, trade or profession:
> 1. in which the Insured Employee was employed with the Employer prior to Disability; and
> 2. which was his or her primary source of earned income prior to Disability.
>
> It includes any work in the same occupation for pay or profit; whether such work is with the Employer, with some other firm or on a self-employed basis. It includes the main duties of that occupation as performed in the national workforce; not as performed for a certain firm or at a certain work site.

*Id.* at 47. Once the "Own Occupation Period" passes, "total disability" occurs when "due to a Disability the Insured Employee is unable to perform all of the material and substantial duties of his or her own or any other gainful occupation which his or her training, education, experience or physical or mental capacity will reasonably allow." *Id.* at 59.

> Additionally, the Policy states that
>
> the Company has sole authority to manage this Policy, to administer claims, to interpret Policy provisions, and to resolve questions arising under the Policy. The Company's authority includes (but is not limited to) the right to:
> 1. establish and enforce procedures for administering this Policy and claims under it;
> 2. determine Employees' eligibility for insurance and entitlement to benefits;
> 3. determine what information the Company reasonably requires to make such decisions; and
> 4. resolve all matters when a claim review is requested.

---

[5] The policy provides that if the onset of the disability occurs when the insured is under the age of 60, the benefits last until age 65. Admin Rec. at 42. Thus, because plaintiff was less than 40 years old when the disability began he is potentially eligible for monthly benefits for over 25 years. *See id.* at 447 (listing Plaintiff's date of birth as August 3, 1969; stating that Plaintiff's last day of work was June 9, 2006).

>Any decision the Company makes in the exercise of its authority shall be conclusive and
>binding.

*Id.* at 49.

II.     Administrative Adjudication of Plaintiff's Claim

Plaintiff first submitted his claim for long-term disability benefits under the Policy in 2006. On December 21, 2006, Plaintiff's employer submitted an Employer's Statement to Defendant, stating that Plaintiff's position was "Case Manager/Therapist" and that Plaintiff had last worked on June 9, 2006. *Id.* at 447. Plaintiff submitted an Employee Statement on January 5, 2007 in which he stated he was unable to "function normally due to limited mobility & pain" and that he had "difficulty driving, typing and sitting for long periods." *Id.* at 431-32. Plaintiff also listed his treating physicians on this form. *Id.* at 432. Dr. Main, a neurosurgeon, submitted a Physician's Statement in which he found that Plaintiff suffered cervical radiculopathy and had undergone an "anterior cervical discectomy fusion." *Id.* at 433. Dr. Main further stated that Plaintiff had "moderate limitations – capable of doing clerical work" and that he was "unable to drive long distances and [was] currently on meds which may alter mental status slightly." *Id.* at 434. Other medical records gathered by Defendant in January 2007 (*see id.* at 418-424) demonstrate that Plaintiff had been diagnosed with degenerative disc disease and a herniated disc in his neck (*id.* at 387) and had undergone cervical fusion surgery to correct the herniated disc (*id.* at 407).

Plaintiff's initial claim for long-term disability benefits was approved via letter from Defendant dated February 7, 2007. *Id.* at 349-52. The letter described important policy provisions and instructed the Plaintiff to promptly reply to any requests made by the insurer during coverage. *Id.* The letter did not guarantee benefits for any period of time, stating that Plaintiff would receive monthly benefits "as long as [he] remain[ed] eligible by the terms of this policy." *Id.* at 349.

Three months later, Defendant obtained updated records from Dr. Main, which indicated that in April 2007, Plaintiff reported that his neck pain was constant yet bearable with medications. *Id.* at 326. At that time, Dr. Main instructed Plaintiff to continue on his medications and that surgery would be

considered if symptoms worsen. *Id.* The Administrative Record reflects no further treatment of Plaintiff by Dr. Main after April 2007. *Id.* at 264, 297-98.

On October 4, 2007 Defendant sent a letter to Plaintiff requesting that he provide Defendant with a list of his "current treating medical providers." *Id.* at 296. Having received no response to this request by Plaintiff, on November 5, 2007 Defendant sent Plaintiff a letter stating that his disability benefits "beyond November 9, 2007 have been suspended" due to Plaintiff's noncompliance with the Defendant's request for information regarding current treating physicians, in accordance with the Policy. *Id.* at 295; *see id.* at 50 (Policy language: "Proof of continued Disability, regular care of a Physician, and any other income benefits affecting the claim must be given to the Company. This must be supplied within 45 days after the Company requests it. If it is not, benefits may be denied or suspended."). Subsequently, on November 8, 2007, Plaintiff identified two current treating physicians: Dr. Main, his neurosurgeon, and Dr. Sorensen, a pain management specialist. *Id.* at 293.

Medical records show that Plaintiff saw Dr. Sorensen four times between October 21, 2007 and November 27, 2007. *Id.* at 286-89. In his initial visit with Dr. Sorensen, Plaintiff complained of neck and left arm pain, sudden onset of pain in neck and left shoulder, decreased sensitivity and motion in the left arm, and migraines. *Id.* at 289. On November 27, 2007 Plaintiff visited Dr. Sorensen with complaints of decreased ability to concentrate and focus, insomnia, nausea, and constipation. The medical record for this visit states Plaintiff was "doing better pain-wise." *Id.* at 286. In January 2008, Defendant sent Dr. Sorensen an occupational description for "Case Worker" and requested Dr. Sorensen's opinion of whether Plaintiff could return to "light occupation" work. *See id.* at 272-78. Defendant sent a copy of this letter to Defendant, requesting his assistance in the submission of Dr. Sorensen's opinion. *Id.* at 271. Dr. Sorensen did not respond to this request. *See id.* at 268. Defendant then contacted Plaintiff to notify him of this situation and again requested his assistance in the collection of medical records from his treating physician. *See id.* at 264. On April 7, 2008, Defendant faxed additional medical records demonstrating that Dr. Sorensen continued to treat Plaintiff between December 26, 2007 and March 27, 2008. *Id.* at 255-59.

A internal medical review of Dr. Sorensen's medical records was completed by registered nurse Linda Brandenburg on April 16, 2011. *See id.* at 16-17. Brandenburg stated that the pain management care provided by Dr. Sorensen appeared to be conservative in nature. *Id.* at 17. She further noted that from the medical records available, Plaintiff should not be precluded from working "in a light occupation from [April 9, 2008] forward, with the exception of no repetitive overhead lifting." *Id.* Subsequently, on April 21, 2008, Defendant denied Plaintiff's claim for long-term disability and notified Plaintiff via letter. The letter delineated the records and documents reviewed, described Defendant's reasoning for the denial, and instructed Plaintiff of his right to appeal and the procedure for appeal. *Id.* at 239. Though Defendant had determined that Plaintiff was not "totally disabled" according to the Policy and was therefore ineligible for disability benefits on April 21, 2008, Defendant extended one additional monthly benefit to assist Defendant in his return to work. *See id.* at 3-4.

On June 17, 2008, Plaintiff wrote to Defendant requesting information in anticipation of making an appeal. *Id.* at 236. Defendants responded on July 2, 2008 with copies of documents used in the consideration of Plaintiff's claim, including the claim file, Policy, job description provided by Plaintiff's employer, the occupational definition from the Department of Labor's Dictionary of Occupational Titles (DOT), all doctors' medical records and medical information, and medical and vocational reviews. *See id.* at 234-35. After further communication between the parties (*see id.* at 221-29), Plaintiff submitted his first appeal on October 24, 2008, which included, among other things, argument in response to Defendant's initial denial of his claim (*see id.* 193-200), a personal statement of how his disability has affected his ability to work (*see id.* at 202-04), and additional medical records from Dr. Sorensen and letters from Dr. Sorensen and Dr. Gonzalez (*see id.* at 211-20).

The medical records from Dr. Sorensen demonstrated that Plaintiff continued monthly visits between March 27, 2008 and September 23, 2008. *Id.* at 211-17. The letters from Dr. Sorensen states that, "Gregg Whitfield is unable to work full time," and "[h]is inability to work is due to chronic pain, headaches, and difficulty with movement," and he is "experiencing some problems with the sedative effects of his medication." *See id.* at 218-19. Dr. Gonzalez stated that Plaintiff was under his care for

5

neck pain, cervical spondylosis and stenosis subsequent to his fusion surgery in 2006, and that Plaintiff was experiencing increasing left upper extremity pain. *See id.* at 220.

Defendant acknowledged receipt of Plaintiff's first appeal by letter dated October 29, 2008. *Id.* at 161. In response to the appeal, Defendant sought a complete occupational analysis report and an independent medical evaluation/peer review. *See id.* at 3. The independent medical review was completed by Dr. Jonathan Sands, board certified in Internal Medicine, Psychiatry and Neurology. *Id.* at 159. After reviewing the medical records, Dr. Sands noted that the record contained "no recent musculoskeletal or neurologic examinations" and stated that "the restrictions and limitations placed upon the claimant's work activities by the attending physician(s) are not reasonable and consistent with medical findings" because they are "not supported by . . . objective documentation of a loss of range of motion of any joint, or any objective documentation of a neurologic impairment." *Id.* at 156-57. Dr. Sands found that there was no documentation of any condition, deficit, or limitation that would prohibit Plaintiff's performance of light or sedentary work, and concluded: "Given the radiographically documented cervical spondylosis it is reasonable that the claimant has cervical pain and restriction of motion without any objective neurologic deficits present. He could safely perform full time light duty work." *Id.* at 158-59.

On December[6] 18, 2008, Defendant sent Plaintiff a letter informing him that after review of his appeal, Defendant was still "unable to approve benefits." *Id.* at 140. While recognizing that Plaintiff's appeal claimed his job required "medium to heavy" duty, Defendant highlighted the fact that the "Own Occupation" term was defined by how that occupation was performed in the "national workforce; not as performed for a certain firm or at a certain work site." *See id.* at 141. Defendant went on to emphasize that the job description provided by Plaintiff's employer and signed by Plaintiff described functions that amounted to "light work," which is defined as "standing or walking for six hours out of an eight-hour day, lifting no more than 20lbs occasionally . . . and possible frequent lifting of small objects weighing less than 10 lbs." *See id*. Defendant also noted, "the primary duty of the case manager is social work and

---

[6] The original letter was misdated as November 18, 2008. Admin. Rec. at 140. Review of Defendant's internal notes on the Long-Term Disability Claim Profile demonstrate that the first appeal was actually disposed of in December, 2008. *Id.* at 3.

program evaluation, not driving." *See id.* Finally, the letter cited Dr. Sands' independent medical evaluation as basis for Defendant's finding that Plaintiff's condition did not "meet the policy provision of totally disabled." *See id.* at 143.

By letter on January 16, 2009, Plaintiff requested additional information from Defendant in order to prepare a second and final administrative appeal. *See generally id.* at 137-39. Defendant responded in writing on February 19, 2009 and provided a complete copy of Plaintiff's claim file including copies of all phone notes, requested curriculum vitas, medical and vocational reviews, and the Policy. *See id.* at 134-36. On February 28, 2009[7] Plaintiff filed his second and final appeal with Defendant. *See id.* at 111-33. Notably, attached to the Plaintiff's second appeal is a Medical Source Statement regarding Plaintiff's physical capabilities completed by Dr. Sorensen on February 22, 2009. *See id.* at 128-33. In the Statement, Dr. Sorensen indicates that Plaintiff's symptoms include neck and shoulder pain, migraine headaches and fatigue, among other things. *See id.* at 128. Dr. Sorensen noted that the "positive objective signs" of Plaintiff's pain were a reduced range of motion in the cervical spine and shoulders, reduced grip strength, sensory and reflex changes, impaired sleep, weight change, tenderness, trigger points, swelling, muscle spasm, and muscle weakness. *See id.* Depression and anxiety were recognized as psychological conditions affecting Plaintiff's pain. *See id.* at 129. Dr. Sorensen concluded that Plaintiff was severely limited in his ability to deal with work stress, could not stand or sit for more than fifteen minutes without changing position, was limited to one hour each of sitting and standing per eight-hour work day, needed to elevate legs to relieve pain, and that Plaintiff would need to lie down or recline in a supine position in excess of six hours during an eight-hour work day. *See id.* at 130-31.

To evaluate Plaintiff's final appeal, Defendant ordered both an occupational analysis from a vocational expert and a second independent medical evaluation. The occupational analysis was completed on April 2, 2009 by Debora Frazee. *See id.* at 2, 455-56. The occupational analysis highlighted the distinction between "occupation" on the national scale and job-specific requirements, noting that

---

[7] Plaintiff's second appeal is inaccurately dated February 28, 2008; it was actually submitted on February 28, 2009, as demonstrated by Defendant having received the document on March 4, 2009. *See id.* at 86, 111.

under the language of the Policy it is one's total disability from the "occupation in the national economy" that is relevant, not disability from job-specific conditions. *See id.* at 456. Further, "[t]ravel in and of itself does not add physical requirement to the work and may be considered job specific." *Id.* Ms. Frazee specifically noted that in the instant case, driving "could be performed by an alternate driver . . . ." *Id.* Ms. Frazee concluded that "Based upon the available information, it would appear that Mr. Whitfield's job is that of a case worker (social service worker), listed in the DOT as # 195.107-010. This occupation is **sedentary** physical requirement by U.S. Department of Labor Standards." *See id.* at 455 (emphasis original). This conclusion differs from Defendant's original assertion that Plaintiff's work involved "light duty." *See, e.g. id.* at 141, 241.

The independent medical evaluation was completed by Dr. Vicki Kalen, board certified in Orthopedic Surgery on April 28, 2009. *See generally id.* at 80-84. After a thorough review of Plaintiff's medical records (*see id.* at 80-82), Dr. Kalen reached the conclusion that the restrictions placed on Plaintiff by Dr. Sorensen were not accurate or appropriately tailored to his diagnoses:

> [T]he restrictions and limitations placed upon the claimant's work activities by the attending physician(s) are not reasonable and consistent with the medical findings. The restrictions outlined by Dr. Sorensen on his Medical Source Statement of 02/20/2009 are not consistent with neck pain and/or cervical radiculopathy and degenerative disease. With the diagnoses Dr. Sorensen has given the claimant, there is still no explanation for restrictions in sitting, standing, needing to elevate legs to relieve pain, and having to lie down for one hour after standing for less than fifteen minutes. These are restrictions that have nothing to do with cervical pathology. In fact, the only mention of a restriction that would be consistent with cervical radiculopathy and degenerative disease is regarding neck motion. Dr. Sorensen said that the claimant could occasional [*sic*] flex and rotate his neck which is less of a restriction than Dr. Sorensen gave the claimant in all other activities. This is inexplicable and counter to the diagnoses the claimant was given.
> . . .
> The findings reported in the Medical Source Statement on 02/20/2009 by Dr. Sorensen are not documented in Dr. Sorensen's office notes and are entirely vague giving no details or specific nerve root involvement. There is no objective documentation on either physical examination, imaging, or electrodiagnostic testing to support any restrictions or limitations in this claimant beyond the date of 05/09/2008.

(*see id.* at 83-84).

By letter dated May 19, 2009, Defendant provided Dr. Kalen's evaluation to Plaintiff in order to provide Plaintiff "the opportunity to provide this assessment to your treating physician for further

8

review." *Id.* at 73. Defendant instructed Plaintiff that "[i]f your physician should disagree with the assessment then we would appreciate any information that he or she could provide to us that would dispute [Dr. Kalen's] findings." *Id.* The letter also informed Plaintiff that if no response was received by June 9, 2009, Defendant would continue the requested review and render a final decision on the claim. *See id.* After receiving no response from Plaintiff, Defendant proceeded with its final review of Plaintiff's long-term disability claim on June 12, 2009. *See id.* at 2. Defendant completed its review on June 25, 2009 and informed Plaintiff of its decision upholding the denial of long-term disability benefits by letter. *See generally id.* at 67-72. The letter discussed the most recent occupational analysis, summarized and responded to Plaintiff's arguments in his first and second appeals, cited Dr. Kalen's findings that the medical records did not support Dr. Sorensen's stated restrictions, and concluded that "[t]here is insufficient medical documentation in the file to support that you would have restrictions and limitations from performing your own occupation." *See id.* at 68-72. The letter concluded by advising Plaintiff that his administrative appeal was exhausted and he had the right to pursue litigation. *Id.* at 72.

III.  Procedural History

Plaintiff chose to pursue litigation by filing a Complaint against Jefferson Pilot Financial Insurance Company on February 17, 2010. The Complaint requested a declaratory judgment stating that Plaintiff is entitled to long-term disability benefits under the policy. Docket No. 2. The Complaint was amended on March 10, 2010 to replace defendant Jefferson Pilot with current defendant Lincoln National Life Insurance Company, as a result of the companies having merged during the pendency of Plaintiff's administrative claim. Docket No. 4; *see supra* note 4. The case was fully briefed pursuant to an ERISA schedule. *See* Docket Nos. 17, 20, 21, 25, 26, 29.

## DISCUSSION

I.  Standard of Review and Conflict of Interest

When the governing ERISA plan or policy gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a challenge to the the administrator's decision is to be reviewed under an arbitrary and capricious standard. Firestone Tire &

Life Ins. Co. v. Bruch, 489 U.S. 101, 155 (1989); Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1002-03 (10th Cir. 2004) (quoting *Firestone*, 489 U.S. at 115). However, if the plan administrator or fiduciary operates under a conflict of interest, such conflict may provide reason for the court to give the administrator's decision less deference under the arbitrary and capricious standard. *See Fought*, 379 F.3d at 1005 (quoting Ladd v. ITT Corp., 148 F.3d 753, 754 (7th Cir. 1998) (adopting "sliding scale" analysis for ERISA conflict of interest analysis, wherein "the court will always apply an arbitrary and capricious standard, but the court must decrease the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict."). Courts are instructed to weigh any conflict of interest as a factor, in combination with other case-specific factors, to reach a determination as to whether the administrator's decision was arbitrary and capricious. Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187 (10th Cir. 2009) (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)). The Supreme Court gave an example of this sliding-scale deference in *Metropolitan Life Insurance Co. v. Glenn* by stating that a conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." 554 U.S. at 117.

In the instant case, the Policy clearly gives Defendant Lincoln National discretionary authority over the administration of the ERISA policy, therefore Defendant's decision is subject to the arbitrary and capricious standard of review pursuant to *Firestone*. *See* Admin. Rec. at 49 (language of policy: "the Company has sole authority to manage this Policy, to administer claims, to interpret Policy provisions, and to resolve questions arising under the Policy"); *see also supra* BACKGROUND part I. Defendant does not appear to contest Plaintiff's allegation that Lincoln National operates under an inherent conflict of interest because it operates as both the insurer and the administrator of the Policy under which Plaintiff was insured. *See* Response at 6-7, Docket No. 26; *see also Fought*, 379 F.3d at 1006. Defendant does, however, contest Plaintiff's argument that Defendant's inherent conflict of interest should be given substantial weight. *See id.* Plaintiff's argument in favor of giving the conflict of interest substantial

weight turns on its assertion that the value of long-term disability benefits for Plaintiff surpassed $800,000.00,[8] a large quantity of money that Defendant would not want to lose. *See* Plaintiff's Opening Brief at 2, 5, Docket No. 20. While *Glenn* recognizes that a conflict should be given more weight when it is more likely to affect the benefits decision—and it could certainly be argued that a substantial monetary loss would affect and administrator's decision—*Glenn* also recognizes that a conflict is "less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy." 554 U.S. at 117.

In this case, Defendant has in fact taken steps to reduce bias and promote accuracy. The Tenth Circuit stated in *Holcomb v. Unum Life Insurance Co. of America* that the insurer-defendant in that case, Unum, "took steps to reduce its inherent bias by *hiring two independent physicians* . . . . Unum did not rely solely on the evaluations and medical opinions of its own on-site physicians and nurses." 578 F.3d 1187, 1193 (10th Cir. 2009) (emphasis supplied). Like the defendant in *Holcomb*, Defendant herein hired two independent physicians to review the records: Dr. Sands reviewed the records for the first administrative appeal, and Dr. Kalen reviewed the records for the second administrative appeal.

The Tenth Circuit also noted in *Holcomb* that the defendant "diligently endeavored to discover the nature of [Plaintiff's] ailments [by] routinely request[ing] [Plaintiff's] updated medical records . . . conduct[ing] its own clinical reviews of these records . . . solicit[ing] expert evaluations . . . and . . . perform[ing] both vocational assessments and occupational analyses." *Id.* This diligent review served as evidence supporting the court's conclusion that the insurer-defendant's conflict of interest was minimal and deserved little weight. *See id.* Defendant Lincoln National has completed the same type of diligent review. Defendant repeatedly requested medical records from the Plaintiff and his treating physicians beginning soon after Plaintiff's initial claim in December 2006. Defendant even allowed Plaintiff's physician, Dr. Sorensen, the opportunity to respond to Dr. Kalen's report, which strongly disagreed with Dr. Sorensen's opinion of Plaintiff's restrictions. One in-house registered nurse reviewed the claim file,

---

[8] Defendant believes the actual value of benefits to be closer to $525,000.00, but in any case argues the calculation of benefits cannot be determined at this time and is irrelevant to whether its decision was arbitrary and capricious. *See* Defendant's Response Brief at 2, 6-7, Docket No. 26.

followed by two independent physicians hired by Defendant, each analyzing a different level of appeal. Defendant also undertook occupational analysis at each level of appeal. The facts in this case demonstrate that, as the Tenth Circuit found in *Holcomb*, the conflict of interest factor deserves "limited weight" in the evaluation of whether Defendant Lincoln National's determination to deny long-term disability benefits was an abuse of discretion. *See id.*

II.     Defendant Lincoln National's Denial of Plaintiff Whitfield's Claim

The court finds that Defendant Lincoln National's decision to deny Plaintiff's claim for long-term disability benefits was not arbitrary or capricious. In fact, the determination that Plaintiff did not qualify as "totally disabled" for his "own occupation" pursuant to the terms of the Policy is wholly supported by the Administrative Record. Though Dr. Sorensen, Plaintiff's pain management physician, essentially concluded that Plaintiff was severely restricted by pain and limited mobility and was therefore unable to work full time (*see generally* Admin. Rec. at 128-33, the Medical Source Statement), those conclusions were drastically undermined by Dr. Kalen's report which stated, among other things, that the restrictions suggested by Dr. Sorensen had "no relationship to [Plaintiff's] cervical impairment in any way" (*see id.* at 84). ERISA policy administrators are not required to give special weight to a treating physician's opinions; they may credit any reliable evidence appearing in the administrative record. *See* Black & Decker Disability Plan v. 538 U.S. 822, 834 (2003) (holding that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation why the credit reliable evidence that conflicts with a treating physician's evaluation").

For example, in *Grosvenor v. Qwest Communications International*, the Tenth Circuit held that it was not an abuse of discretion for the administrator to consider, but not credit the opinions of treating physicians when such opinions were "unsupported by 'objective' medical documentation that the Plan requires and indeed, neither doctor explained why [Plaintiff's disability] would preclude him from performing any of his managerial responsibilities." 191 F. App'x 658, 663 (10th Cir. 2006) (unpublished). The court went on to note, "The Administrator's decision concerning the weight to be given [the]

12

opinions [of treating physicians] after considering the underlying evidence or lack thereof differs from ignoring them." *Id.* It is within reason for a plan administrator to reject a physician's report "when there was no accompanying data to support that conclusion." *Id.* (citing Kimber v. Thiokol Corp., 196 F.3d 1092, 1099 (10th Cir. 1999). In the instant case, the Administrative Record demonstrates that Defendant considered the opinions of the treating physicians—it even solicited the opinion of Dr. Sorensen on more than one occasion (*see* Admin. Rec. at 73, 266-67)—though in the end Defendant decided not to credit the opinions of the treating physicians. One obvious reason for its decision to discredit the treating physicians' opinions was that both independent physicians reviewing the Plaintiff's records noted that there was no objective data supporting those opinions (*see id.* at 82-84 (Dr. Kalen), 156-58 (Dr. Sands)). Additionally, Dr. Kalen's report stated that "[t]he restrictions and limitations given [Plaintiff by Dr. Sorensen] have no objective foundation and are not even consistent with the diagnoses the claimant has been given." *See id.* at 83. Plaintiff failed to rebut Dr. Kalen's report, despite being given the opportunity to do so. Thus, under the circumstances, it was reasonable for Defendant to credit the findings of the independent physicians and doing so was neither arbitrary nor capricious.

Plaintiff makes at least one argument that merits consideration. Plaintiff argues that Defendant should have ordered him to undergo a functional capacity examination, which he alleges would have definitively shown whether he was capable of performing work duties in his occupation. *See* Plaintiff's Opening Brief at 5-8, Docket No. 20. This argument is unpersuasive. At the outset, the court notes that under the terms of the Policy the claimant bears the burden of submitting proof of continuing disability (*see* Admin. Rec. at 50) and Plaintiff could have supplied a functional capacity examination at any point during the administrative process. Moreover, caselaw cited by Plaintiff to support this argument is either unpersuasive or distinguishable. For example, Plaintiff correctly cites *Hightshue v. AIG Life Insurance Co.* for the proposition that "when it is 'possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in *an intensive and scrupulous independent investigation* of their options to insure that they act in the best interests of the plan beneficiaries.'" 135 F.3d 1144, 1148 (7th Cir. 1998) (citing Leigh v. Engle, 727 F.2d 113, 125-26 (7th Cir. 1984)) (emphasis supplied); *see* Plaintiff's Opening Brief

13

at 5, Docket No. 20.  This quotation is indeed correct, however Defendants have not failed to "engage in an intensive and scrupulous independent investigation" simply because they did not compel a functional capacity examination.  In affirming the denial of benefits, the *Hightshue* court found that the "intensive and scrupulous independent investigation" standard was fulfilled by the defendant's regular collection of the claimant's medical records, submission of those records to an independent and qualified medical expert, and providing that expert with complete and accurate information.  *See Hightshue*, 135 F3d at 1148.  Defendant has done nothing less in this case, and in fact it has done more by submitting Plaintiff's claim file for review by *two* independent physicians who were board certified in relevant areas of medicine.  The additional cases cited by Plaintiff in support of this argument are similarly unpersuasive.[9]  Defendant's failure to order a functional capacity evaluation does not render its final determination on the merits arbitrary and capricious.

In conclusion, the court finds that Defendant Lincoln National's denial of Plaintiff's claim for long-term disability benefits was not arbitrary and capricious.  On the contrary, Defendant's determination was reasonable.  The court can find no evidence of bias resulting from the inherent conflict of interest in the Administrative Record.  Defendant diligently collected and updated Plaintiff's medical records throughout the appeal, twice provided complete medical records to independent physicians who performed medical evaluations based on their relevant expertise, and even provided Plaintiff and his treating physician the opportunity to respond to one independent physician's negative review. Plaintiff was given every opportunity to put forth his best argument and evidence in support of his claim, and after he failed to respond to Defendant's final request, the appeal was denied based on credible evidence.

## CONCLUSION

---

[9] Plaintiff additionally cites Toland v. McCarthy, 499 F. Supp. 1183 (D. Mass. 1980) and Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 804-08 (10th Cir. 2004).  The court finds *Toland* unpersuasive for substantially the same reasons set forth in Defendant's Response Brief at 9, Docket No. 26.  In *Gaither*, the Tenth Circuit held, "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement *and* when they have little or no evidence in the record to refute that theory."  394 F.3d at 807 (emphasis supplied).  The court finds that *Gaither* is distinguishable because (a) the *potential that* a functional capacity evaluation could be completed is not the equivalent of "readily available information," and (b) Defendant Lincoln National did in fact have significant evidence to refute Plaintiff's theory of entitlement, including the independent medical evaluations, among other things.

For the reasons cited herein, Defendant Lincoln National's denial of Plaintiff Whitfield's long-term disability claim is hereby AFFIRMED. A separate Judgment is filed herewith.

IT IS SO ORDERED this 30th day of September, 2011.

James H. Payne
United States District Judge
Northern District of Oklahoma